We have four cases on the calendar this morning, three patent cases and a veteran's appeal which is being submitted on the briefs and will therefore not be argued. But before we tend to our scheduled arguments, I have a motion to make and I would like to move and Judge Bryson will be acting presider for the purpose of this motion. I move the admission of Miles Jacobs-Sweet who is a member of the Bar and in good standing with the highest court of New York. I have knowledge of his credentials and I'm satisfied that he possesses the necessary qualifications. And the reason I know all that is because Miles has been my law clerk for most of two years. He's been enjoyable to work with. He has great knowledge of the law and science. He's a hard worker. He exercises good judgment and he's served me very well and I know he'll be a success in the rest of his career. So with that, I move the admission of Miles-Sweet and I ask Judge Bryson to act on it. Very well. Judge Lurie, your motion is granted and the applicant will be admitted. Thank you. Miles, will you be prepared to step up and take the oath of office? Mr. Chairman, do you solemnly swear that you will conform to yourself and the attorney and counsel of this court, uprightly and according to law, and that you will support the Constitution of the United States? I do. Thank you. Welcome, Judge. The first case is Homeland Housewares et al. v. Sorenson Research and Development Trust, 2013-1345, Ms. Shackelford. Good morning and may it please the Court, I would like to start this morning by addressing the claim construction issue before the Court today. Sorenson seeks reversal of the District Court's claim construction of threshold rate because it imports three additional limitations into these claims. Two of those limitations do not find any basis in the intrinsic record, those two limitations being the temporal restriction, which would require test strips being made at the time the rule was made, and the other limitation being this step of determining the precise value of the threshold rate. Neither of those are supported by the intrinsic record. The third limitation is the step of making test strips. This is an improper attempt to limit the inventor's invention to their best mode. There is no clear disavowal of claim scope here. This Court, just on Monday, issued the X to Y attenuators case and talked again about clear disavowal of claim scope, that was Appeal 13-1340, and acknowledged again that disavowal is an exacting standard. It requires words of restriction and exclusion, and there is no such disavowal here. Let me see if I understand what your theory of claim construction is with respect to the and had some section of the product beyond the gate in which there was an increase in thickness of the wall, and it turns out there were no voids in that product. Would you say that product necessarily infringes? If the increasingly thick section, if that zone is lying between those flow chambers, then yes, it does. So if you had two flow chambers, one on either side of this cup-shaped device, if something in the middle area, so if the plastic at any point in the middle went from narrower to thicker, and there were no voids, then that's infringing. Yes, it is. Even if the entire surface were more or less regular, but if you could find any section of the surface between the gate and the lip of the cup that went from thinner to wider, then the whole thing would infringe. But only, again, Your Honor, only if that increasingly thick section was lying between two opposed flow chambers. Exactly. My hypothesis is that there are two flow chambers in that structure. Okay. So you would have, in effect, what you're saying is as soon as I see no voids in that That's right. And so that's what the invention is teaching, is that you can't increase the thickness of your thin wall section, but what the inventors discovered is that you need to keep it below a threshold rate. And if you do that, then you will prevent the flow from creating the voids in that increasingly thick section of the thin wall section. Just following up on Judge Bryson's question and your response, doesn't your response read out of the claim the whole limitation of a threshold rate? Because now the claim could just have simply been rewritten to say increasing the wall thickness such that, you know, but still preventing voids from forming. And then there's no language left on the threshold rate. No, I don't believe so. Because the claim language reads with the increase being at less than a threshold rate, and then the claim language then defines what that means. It explains that increasing at less than a threshold rate is the way that you prevent the plastic material from flowing in such a way that it creates a void. And how do you do that to design your wall thickness or the rate of the wall thickness to come below a threshold rate? Isn't there some kind of testing that needs to be done in order to achieve your desired result of coming in under a threshold rate? Well, what the evidence from the record showed was that there can be testing, there can be testing when you've reached the threshold rate, when you've exceeded it, and when you've not. And the best mode that the inventors showed was this idea of making test strips. And other ways that were described in the evidence were using a computer simulation of some sort or some sort of a polarized lighting method. The other testimony that was in the record is that skilled artisans, once reading the create an increase in thickness that may keep it below a threshold rate. Now, the threshold rate would be affected, I take it, by all sorts of other variables, right? In other words, suppose the temperature of the mold was higher rather than lower, then the threshold rate would be different, would it not? Or suppose... It would change what the threshold rate is. I mean, that's very true. The flow of plastic in a mold cavity is affected by a number of parameters. But what the inventors... But the only way to know what the threshold rate is, I take it, to come back to Judge Chen's question, is to find out that you have no void. And then you know you're not above the threshold rate. Isn't that it? That's exactly right, Your Honor. And even if the increase is by, let's say, one... I know it's not true here, but suppose it's by 10 microns, which is one hundredth of a millimeter, from one section to another section, you would say, nonetheless, that increase infringes if there are no voids, assuming that you have... Assuming that you've met the rest of the... Just because there's no void, even though the absence of the void may be attributable to any of a number of other factors. But there is no evidence that the absence of voids are attributable to other factors. But I thought you just told me that if, for example, the heat is a factor that could affect the flow of the plastic, presumably you would avoid voids with a hotter mold, for example, and allows flow to go farther than it would otherwise. There are all sorts of things that can avoid voids, I take it. The thickness of the... The relative thickness of the wall is not the only way you avoid voids, right? Actually, no. I think that's where the misunderstanding is here. And let me step back for one second. I mean, suppose I've got a really thick cup with, let's say, half a centimeter wide. The plastic is going to flow through that cup, and suppose the cup is not very deep. So the plastic is going to flow freely through that mold, right? I mean, it's not going to create molds, I would say, or voids, right? Let's see. If it's a .2 millimeter thickness... No, no, a 5 millimeter thickness. A 5 millimeter thickness. Pretty thick, yeah. Yeah. Whether or not it's going to create voids, I'm not... I can't technically speak to that. I mean, I would think that it would at a certain point. But what I wanted to get back to really quickly, with respect to these other parameters that are injection parameters that affect flow in a mold, Mr. Sorensen and Mr. Brown spent many years looking at this issue. The only parameters that they found that could control voids in this one discrete situation was the adjusting of the mold cavity geometry. There's no evidence in the record anywhere that there's an ability to adjust or to control these voids by adjusting other parameters. What is your affirmative evidence, as of the time of the summary judgment motion, as to the existence of flow chambers in the accused devices? At that point in time, when they went to court on that motion for summary judgment, it's my understanding that Sorensen did testify, Mr. Sorensen testified, that the short shots that were generated, although flawed, showed that plastic was flowing from the flow ribs into the thin wall section, because the position that was taken by Homeland at that time was that the flow chamber limitation was not met because flow was not coming from the flow ribs to the thin wall section. Now, when Homeland went to, when Sorensen approached that flow chamber limitation on the motion for summary judgment, it took the position that Homeland had not even met its initial burden with respect to the flow chamber limitation. The dye tests were the other piece of evidence that were offered, and those dye tests were offered through lay testimony. The district court had already held in an earlier discovery ruling that these dye tests needed to come in through expert evidence. They were technical evidence. They needed the protection, the gatekeeping protection of Rule 702. And so, therefore, they should have been excluded as improperly offered through lay testimony. Here's my problem with the flow, at least with respect to the flow chambers, is that under Celotex, once the moving party has pointed out the absence of affirmative evidence by the non-moving party who has the burden of proof, that the non-moving party has to come forward with evidence that would be sufficient to establish a prime fixture case to show the presence of that element. Now, I've looked carefully at your motion for summary judgment, your opposition, excuse me, to the motion for summary judgment, and I don't see that opposition as having made a point of pointing to affirmative evidence of the existence of flow chambers in the accused devices. All I see is an argument that the other side, the moving party, has not established that there is no flow chamber. But that, under Celotex, is not the burden of the moving party. What the moving party has to do is point out the absence of evidence on the other side, on the part of the non-moving party with the burden of proof, right? Well, that's where the law is a bit confusing, because under Vivitex, and then I found a Ninth Circuit case, Meese on Fire, that talks about how there is an initial burden that the moving, in this case, even though they do not bear the burden of proof at trial, must make. And if they do not meet that initial burden, then the non-moving party does not have an obligation to come forward with any evidence. But the burden, and the Supreme Court in Celotex speaks very explicitly to this, and I'm sure you're familiar with the passage I'm talking about. The Supreme Court, whatever the Ninth Circuit and our court may have said, the Supreme Court gets the last word, as they tell us from time to time. But the burden is to show, as the Supreme Court said, that is, point out to the district court that there is an absence of evidence to support the non-moving party's case. And that's it. That is not an evidentiary burden. With respect to the issue of the flow chambers, there was also testimony from Mr. Sorensen put into the record by Homeland that he knew from experience that these flow ribs were feeding plastic into the thin wall section. And that's corroborated by the knowledge in the prior art that was discussed in the background section of the 460 patent, where it talks that it's already known that the flow ribs were feeding plastic knowing that plastic is flowing from the flow ribs into the thin wall section. And it's also discussed in Smith and Allen, which were both put in front of the court on summary judgment, where they talk about the fact that plastic is flowing from the rib into the thin wall section. Those, though, were in connection with the summary judgment and validity, were they not? Actually, those were also put in front of the court by Homeland's counsel on the motion for summary judgment of non-infringement. But that was not a point that you made in your opposition to summary judgment. As I read the opposition to summary judgment, it was just saying they have a... Is it relevant? So is all of the same parole evidence that was admitted in Texas still in front of the Florida court? It's not the same. There's a parallel declaration in both. What is happening here? There we go. With regard to that, I do not believe those points were directly made. The evidence was in front of the court. But there was evidence, though, from Mr. Sorenson that he did testify that those short shots did show that the plastic was flowing from the flow ribs into the thin wall section. And that testimony was improperly disregarded. Ms. Shackelford, you've just about exhausted your time, but you've been answering questions, so we'll give you back your 3 minutes of rebuttal time. Thank you, Your Honor. We'll hear from Ms. Trojan... Thank you, Your Honor. ...who wants to save 5 minutes for a rebuttal on the cross-appeal only. Are you thirsty? Very thirsty, actually. I brought these. These are the exhibits to Mr. Meyer's declaration in opposition to the summary judgment, which is located at A2314 of the record. These are exhibits 9, 8... No, 8, 9, and 12. And what these show is these ribs are not flow chambers. That's the gate. The gate is not connected to the flow chambers, and so, therefore, when the plastic goes into the mold, it descends uniformly throughout the whole thing. This does not show what you would see if these flow chambers were, in fact, flow chambers. That's what I found puzzling about your reliance on those short shots. Could you turn that so that the most scalloped section is facing us? Those scalloped sections suggest to me, and it was a point made, I think, in Mr. Sorensen's declaration, that the flow is greater alongside closer to, we'll call it the flow chambers for argument's sake, is in the middle of the thin wall area between the two flow chambers. Why is that not just exactly what it shows? Because when the plastic is injected into the mold, not all of the plastic uniformly shoots out in all directions, and so there's a little bit, maybe a little less plastic on this side. Yeah, but it seems to be coincidental that every single one of those has some degree of scalloping. There certainly isn't any one of them that I could see, and certainly from the pictures I couldn't see, in which there was less plastic flow along what we're calling the flow chambers than in what we're calling the thin wall sections. Is that right? That's correct. Doesn't that suggest that the flow chambers are facilitating flow? Well, then you look at Exhibit 12, which is the dye test. So the dye is put... Well, let's stay with the others, because that's where Sorensen's evidence comes in. And Sorensen says in his declaration that number 55, I think it was, that he focused on, proves that these are flow chambers because of the disparity between the level of the flow in the thin wall section and the level of the flow in the so-called flow chambers. Why is he wrong about that? He's wrong because if you look very closely, if you were to examine it, you would see the flow, the actual rippling effect of the plastic coming down. There's never a point where there is this gap where two sides of the plastic are coming together and meeting. If these were flow chambers, the plastic would come over and then meet in the center, and you would see the wave effect along this line. But I don't think that you can look at these short shots in isolation with respect to Exhibit 12 of the Meyer Declaration, which is the dye test. The evidence needs to be... Each part of the evidence should be looked at as a whole. And here we clearly see when you put the dye at the top of the flow ribs, where does it go? None of it. None of it goes into the wall section. None of it. All of it flows directly down. And it literally flows out at the bottom. So it never spread over to the sides. So if there was any doubt because of the scalloping effect, that doubt was cleared up when we presented the dye test. And so once again, Sorenson has presented no tests of its own. It could have done... It even stated, Mr. Brown said, that the standard policy practice was to do their own tests. But they're entitled to rely on your tests. They can rely upon any evidence, including our own evidence. But they ignore the dye test. Was Sorenson... By the way, was he qualified as an expert in this case or presented as an expert? No. No. Okay. His testimony is based just on his experience? Correct. Okay. And then also, we actually measured our cups and showed that they were uniformly thick. Well, Mr. Brown measured them and came to a different conclusion. Mr. Brown, the one drawing that was in evidence at the time of the summary judgment motion was never authenticated. Oh, wait a minute. Mr. Brown testified. If I recall, and I think you were... You took the deposition. Correct. Mr. Brown testified in the deposition by looking at... What were they? 7105, 7106, and 7160, I think were the drawings, right? Correct. And he testified as to all those drawings. And he testified at some length that, number one, he made the drawings. Number two, those drawings corresponded to the photographs that were produced of the measurements that were done on opposite sides of the cup. And that's how he came to the average thickness, and that's represented in the drawings as showing an increase in thickness. Why isn't that authentication and evidence of an increase in thickness? You say that it's completely the same, but he says the contrary based on testing. Well, then the district court didn't recognize... That's the problem. If the district court didn't recognize it, but it was in the record, why isn't Brown's testimony sufficient? He never authenticated what he was actually measuring. He never had any record whatsoever other than this drawing of what... which was the original drawing that they had attached to... sent to us in a cease-and-desist letter that did not correspond to any product that we had. He had a drawing, and he had photographs of the product. What more did he need for authentication, given that authentication is a standard which can be satisfied that anything that the finder of fact could conclude was sufficient to establish that the thing is what it is? What was missing? At the time of the summary judgment, they never presented such evidence, never presented a declaration. Mr. Brown would never put his name on a declaration saying that, yes, in fact, I... these measurements are correct. But the question... my question to you is not about a declaration. It's about the deposition. Why isn't the... doesn't the deposition do full service for what would have been in a declaration had they prepared one? Well, Mr. Brown was actually, as I recall from the deposition, he was quite confused about... because the measurements themselves were inconsistent. Well, he explained the inconsistency because he showed that they were averaged, correct? But then we don't have the original data to even know what he was averaging. You have the photographs which show the Vernier caliper that shows the two figures that were averaged. And sure enough, the numbers that show on the diagrams are the average between the two measurements in each instance, correct? But you don't know that he's even measuring the same cup. But the photos... But he said he was. I don't recall that specific point. So I'll... Well, I read the deposition with care because it seemed to be a really critical issue in the case. And that's what I took away from his deposition is he was saying, I measured this cup twice and at several different locations and these are the numbers I got and I put them down in the drawing and did that with respect to each of the drawings. Why isn't that enough? I... At this point, I would like to concede that point because I'm... With respect to... I would like to move on to the validity of the patent. All right, the court will permit me. With respect to indefiniteness, the standard of indefiniteness has now been changed by Nautilus versus biophig instruments and the insoluble ambiguity test is no longer used where it's now a question of whether the patent claim fails to inform with reasonable certainty. The threshold rate clearly fails to inform with reasonable certainty because no one can read the claim and know what to avoid without first creating a successful product and then measuring that product. At that point, all they're doing is measuring an inherent quality of a product that they have created themselves without any teaching. The patent claim says that... Doesn't the specification tell how to do the test and determine the threshold rate? Correct, in that it says that... It doesn't say how to determine the threshold rate. It simply tells you how to observe the threshold rate because you first must succeed in creating a product without voids in order for you to know what the threshold rate is. So the patent has not taught anything new to anyone of how to create a mold. Can you back up a second? I was trying to understand your cross appeal and I was wondering if it was a conditional cross appeal in the sense that the district court gave what looked like a pretty specific narrow construction of the term threshold rate and then that's led in part to your summary judgment. Correct. And I guess are you suggesting that if we were to reverse the claim construction then there would be an indefiniteness problem or even in light of this very specific narrow claim construction of threshold rate by the district court if we were to agree with that there would still be an indefiniteness defect? I think there would still be an indefiniteness defect because the measuring, the claim construction that requires the measuring of the threshold rate is the measuring that occurs after the product has been successfully completed. But is it your point that we wouldn't need to get to that? You would not need to get to that if the infringement was upheld. That's correct. The issue would be decided. Now, I didn't understand that to be your position in the brief. What I understood from your brief was you were saying if the threshold limitation, the threshold rate limitation construction were changed then you would have a problem with invalidity but not otherwise. You're actually, I misspoke, Your Honor. You are absolutely correct. If the threshold, I think of that as the non-infringement but you're correct. If the invalidity were reversed, I mean if the claim construction were reversed and you had this broader claim construction then clearly you would then have an indefiniteness problem. But you're not arguing, I take it, that if we were to affirm on non-infringement we would not have to reach validity? You want us to reach validity either way if I understood your brief? Correct. Okay. Correct. In other words, it's not conditional. Yeah, now I'm lost. It's conditional only on if we reject the district court's claim construction of threshold rate and go to the defendant's construction of threshold rate. Then you say, aha, now it's invalid because it's indefinite and obvious. Correct. Okay. Correct. And so when you look at that, especially I think the district court really struggled with insolubly ambiguous but now that it's just with reasonable certainty, a claim, and especially with the teaching in Nautilus that we really need to focus on people being able to know what the meets and bounds of a claim are so that when they're actually constructing the mold they know what not to do. Hasn't that always been the case? Irrespective of the adjectives used? That's true. And the Supreme Court said that they shouldn't micromanage your language but they did feel that insolubly ambiguous was not an appropriate term. And so under that standard we think that it is clearly invalid for indefiniteness. And certainly also, I don't want to belabor the point, but it's also clearly obvious once you use their definition because then the claim would read on the prior art. Because when you look at Allen, Allen taught the ribs and Smith taught the bearing thickness. Smith did not have ribs, correct? Did I read it correctly? Correct. But it had the increase in thickness. Right. And so you combine those two references. It's easy to combine those two references to reach this obviousness observation. And under their... Is your argument different than maybe what the examiner was considering? Because obviously the examiner had these two very references in front of it. The examiner's mistake was believing that an observation about the prior art that had not previously been observed was somehow an invention. It's not invention. Merely to observe that, oh, there's a threshold right here. Smith is teaching increasing thickness. Let's see, my time is out. It's okay. Finish the sentence and your answer to Judge Stewart. Smith is teaching the increasing thickness and Allen is teaching the ribs. And if you take Allen or Smith, neither one of them using these methods resulted in a gaseous void. So all they did here was observe. There are no gaseous voids, so therefore that must have met a threshold rate. That would read directly on the prior art. That claim construction would render the patent invalid under obviousness. Well, would it though read on, I guess it's Smith that has the thicker and Allen that has the ribs. Is that right? Correct. Have I got it backwards? No, okay. Since Smith has no ribs, then I assume that Ms. Shackelford would say there's no necessary infringement because of the absence of float chambers. And since Allen does not disclose increased thickness, then that's the absence. Right, but one skilled in the art would not look at these references and say I use one or the other. Well, but I thought what you just said was that each of those references would infringe, but I think Ms. Shackelford would say neither would infringe. Right, but what was being taught in the prior art would have infringed. If you had had the combination, if you, which, it isn't as though people, just like we were talking about earlier, pressure and temperature and things with these factors, all these factors and geometries, they're all, all. Okay. I understand, thank you. Mr. Trojan, as you observed, your time has expired, but we'll give you back three minutes for cross appeals. This is something to respond to. Ms. Shackelford. I think I'd like to start real quickly with the float chamber limitation and just point out that the only counter, it's not evidence, but the only counter statements to Mr. Sorensen's testimony about what was being demonstrated by those short shots was attorney argument and attorney argument is not sufficient to, under summary judgment, it's not a form of evidence. Secondly, I'd like to address real quickly the claim construction issue and point out that it's not necessary for the skilled artisan here to determine the precise value of a threshold rate in order to understand and practice this invention. The inventors preferred embodiment. They did not determine the precise value of the threshold rate. They were determining through their test strip method rates that were above and below until they found a rate that they were satisfied with that did not create voice. The skilled artisan understands the scope of these claims not by assigning a mathematical value, but by looking at the desired result, the prevention of voice. And this court has held that a patentee can assign a functional definition to a term and that's what the inventors did here. They did not indicate that threshold rates should be defined by mathematical precision or by assigning a precise value. How would you define your inventor's contribution to the art? Is it fair to say it was the discovery or appreciation of an insight that if your wall thickness increased at a certain rate below a threshold, then you would get a desirable result? That's basically the insight that was discovered by the inventors, right? Essentially, what they discovered is that there was this flow of plastic going on. Right, and then the claim is calling for some application of that insight. Exactly. Essentially, the last limitation, I mean, it's structured as a process claim, but then the last paragraph seems to be more of a design limitation about what the mold cavity is going to look like, about how these walls, the thickness is going to be increasing at a certain rate, but it has to be below a threshold rate, which all suggest that that limitation is about how you design the walls. And in order to get it below a threshold rate, you have to do some kind of testing. Maybe not test strips, but you have to be consciously designing this thing to try to get it under a threshold rate. I see that my red light is on. Well, you may answer the question. Okay, thank you, Your Honor. The point that I was trying to make was that to the extent that the district court reported a limitation of determining the precise value of each and every threshold rate in a zone in a thin wall section, that does not sit with the patent because there's no support in the patent for that aspect of the court's construction because even the inventors in their preferred embodiment were not determining the precise mathematical value of a threshold rate. Thank you. Thank you, Ms. Shack. Mr. Trojan, there was nothing relating to the Crossfield item, so no further argument in that case. We will take it under advisory.